## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| **MORGAN,** | : | |
| Plaintiff, | : | |
| | : | CASE NO.: 3:20-cv-00254-JBA |
| v. | : | |
| | : | |
| **WATSON, ET AL.,** | : | |
| Defendants. | : | OCTOBER 8, 2022 |

### PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT [Doc. # 64]

### I.    INTRODUCTION

Plaintiff Quan Morgan ("Morgan") opposes grant of summary judgment in favor of the following Connecticut Department of Correction (DOC) Defendants: (1) Capt. Watson ("Watson"); (2) Lt. Koellmer ("Koellmer"); (3) Lt. Domitrz ("Domitrz"); (4) Ofc. Padin ("Padin"); (5) Ofc. Bacchus ("Bacchus"); (6) Off. Boswell ("Boswell"); and (7) Off. Muscaro ("Muscaro"). Morgan abandons his claims against these remaining DOC Defendants: (1) Lt. Hernandez ("Hernandez"); (2) Ofc. Yahary ("Yahary"); (3) Ofc. Mateo ("Mateo"); (4) Ofc. Klingenberg ("Klingenberg"); (5) Ofc. Howard ("Howard"); (6) Ofc. Jones ("Jones"); (7) Ofc. Nogueira ("Nogueira"); and (8) Ofc. Bugbee ("Bugbee").

### II.    PROCEDURAL BACKGROUND

Plaintiff agrees with and adopts the contents of Section II, Procedural Background, in Defendants' Memorandum of Law. (Defs. Mem. at pgs. 2-3 (Doc. # 65))

### III.    GENUINE ISSUES OF MATERIAL FACT

Morgan respectfully refers this Court and Defendants to the Local Rule 56(a)2 Statement of Facts in Opposition to Summary Judgment (hereinafter referred to as "Rule 56" attached to this Memorandum of Law).

## IV.    ARGUMENT

### A.  Standard of Review

Morgan does not dispute the applicability of case law cited by Defendants to the standard of review for considering summary judgment motions in this case: (Defs. Mem. at pgs. 3-5 (Doc. # 65))

1. Defendants' burden in moving for summary judgment is to identify evidence demonstrating an absence of genuine issues of material facts for a jury or court to decide. *Celotex Corp  v. Catrett*, 477 U.S. 317, 323-24 (1986); and

2. If Defendants are able to identify evidence demonstrating an absence of genuine issues of material then the burden shifts to Morgan to set forth facts showing that there are genuine issues for fact for a court or jury to decide. Fed. R. Civ. P. 56(a).

### B.  Morgan Exhausted the Requisite Administrative Remedies for Counts II-IV

#### i.    DOC Waived its Option Under AD 9.6(6)(F) to Reject Morgan's Grievance as Untimely

In Section III(B), Defendants renew arguments from their Motion to Dismiss based on the exhaustion requirements of the Prison Litigation Reform Act of 1996, 42 U.S.C. § 1997e(a). (Defs. Mem. at pgs. 5-8 (Doc. # 42-1)) Defendants cite *Riles v. Buchanan*, 656 Fed. App'x. 577, 579 (2d Cir. 2016) (Summary Order) to support the application of DOC's Administrative Directive (AD) 9.6 to the procedural requirements for inmates to exhaust their administrative remedies. (Defs. Mem. at pg. 9 (Doc. # 65))

An October 6, 2020, declaration by Mykia Cooper ("Cooper Declaration") attaches four exhibits, A-D.  (Ex. A, Cooper Dec. (Doc. # 64-5)) The second page of attached Exhibit D is Morgan's statement that he signed and submitted in his second attempt to file a grievance about

2

the assault. (Ex. 1, Morgan Dec. ¶¶ 52-53) In this statement, Morgan references the grievance as his second attempt to file a grievance. (Ex. 1, Morgan Dec. ¶ 53) The third page of attached Exhibit D is the cover page for Morgan's second attempt to file a grievance. (Ex. 1, Morgan Dec. ¶¶ 54) Prior to Morgan's second attempt, he filed a grievance ("first grievance") attaching the Inmate Request Form (IRF) that he had submitted to Watson on February 17, 2017. (Ex. 1, Morgan Dec. ¶ 55) (Ex. 2, First Grievance) (Ex. 3, IRF)  Morgan filed the first grievance with the Medical Unit ("Medical"). (Ex. 1, Morgan Dec. ¶ 56) Medical returned the grievance to Morgan and he then placed it in the Administrative Remedies (AR) box. (Ex. 1, Morgan Dec. ¶ 55-56) Morgan made a copy of his first grievance and the IRF before submitting the grievance. He never received a response to the first grievance. (Ex. 1, Morgan Dec. ¶ 58) (Ex. 2, First Grievance)

DOC records corroborate Morgan's submission of his first grievance. The first grievance statement references the IRF and the IRF is attached to the first grievance. The first grievance attached the necessary IRF as proof of Morgan's attempt at informal resolution. (Ex. 3, IRF) (Ex. 2, First Grievance) Morgan's second attempt to file a grievance did not attach the necessary proof of an attempt at informal resolution. (Ex. A, Cooper Dec., attached Ex. D at pg. 2 (Doc. # 64-5)) Morgan's second attempt was returned stating: "Your level one grievance is being returned to you without disposition. Please specify the action that you think should be taken to resolve the issue you are discussing." (Ex. A, Cooper Dec., attached Ex. D at pg. 1 (Doc. # 64-5)) Morgan's second attempt at filing the grievance was not rejected which means the IRF filed with the first grievance sufficed. (Ex. A, Cooper Dec., attached Ex. A, AD 9.6(5)(E)(3), 9.6(6)(F) (Doc. # 64-5)) A grievance may be rejected because the IRF was not filed with the grievance  or because the inmate did not provide an explanation for the absence of an IRF. (Ex. A, Cooper Dec., attached Ex. A, AD 9.6.(6)(C), 9.6(6)(F) (Doc. # 64-5))

3

Morgan's grievance was returned, specifically, without disposition because it did not comply with AD 9.6.(6)(E)(3) which incorporates the requirement of AD 9.6.(5)(E)(3) ("The request for an administrative remedy and the action sought should be stated simply and coherently.") (Ex. A, Cooper Dec., attached Ex. A, AD 9.6. (Doc. # 64-5)) A grievance returned without disposition "may be re-filed after the inmate has corrected the error."  (Ex. A, Cooper Dec., attached Ex. A, AD 9.6.(6)(E) (Doc. # 64-5)) Administrative Directive 9.6 does not provide a time limitation for an inmate to re-file a Level 1 grievance after it has been returned without disposition. The grievance was not rejected for untimeliness which Morgan could have appealed. (Ex. A, Cooper Dec., attached Ex. A, AD 9.6(F) and (G) (Doc. # 64-5)) DOC waived any time limitations for Morgan when it denied him the opportunity to appeal had his grievance been rejected as untimely. *See* Ex. A, Cooper Dec. ¶ 14 (Doc. # 64-5) ("On May 9, 2017, the Level-1 grievance was returned without disposition for not complying with the requirements of AD 9.6. Inmate Morgan was instructed to specify the action requested to resolve this issue."). Defendants' argument that Morgan's grievance was untimely not only denies Morgan the opportunity to appeal this decision of untimeliness because the reason for returning the grievance was not for untimeliness which he could have appealed (AD 9.6(F) and (G)) but for not stating simply and coherently the action sought as an administrative remedy. (Ex. A, Cooper Dec., attached Ex. D at pg. 1 (Doc. # 64-5)) (Ex. A, Cooper Dec., attached Ex. A, AD 9.6(6)(E) (Doc. # 64-5)).

Morgan exhausted his administrative remedies in accordance with AD 9.6.

### ii. DOC's Return of Morgan's Grievance was Non-Compliant with AD 9.6(6)(E)(3) and 9.6(5)(E)(3)

DOC Form CN 9606, Grievance Returned Without Disposition, provides six reasons for the return but, in Morgan's case, none of the six boxes are checked. Instead, the form asked Morgan

4

to specify the action Morgan thinks should be taken to resolve the issue he is discussing. (Ex. A, Cooper Dec., attached Ex. D. at pg. 1 (Doc. 64-5)) DOC modified the form by not checking the box, "The grievance and the action requested should be stated simply and coherently." (Ex. A, Cooper Dec., attached Ex. D. at pg. 1 (Doc. # 64-5)) Notice to Morgan by checking the appropriate box would have provided Morgan an opportunity to clarify that his grievance included the excessive use of restraints given his medical condition after he was assaulted and the delay in medical treatment while Koellmer and Domitrz were focused on sending him to the Restrictive Housing Unit (RHU). (Ex. 1, Morgan Dec. ¶¶ 22-23, 30, 32, 37, 41-42) Morgan considered these conditions part of Watson's failure to protect him from a cellmate whom Morgan had reported was dangerous, homicidal, and threatening to use dangerous instrument on others in the facility. (Ex. 1, Morgan Dec. ¶¶ 4, 6)

### iii. Morgan Met a Dead End in the Grievance Process

Morgan met a dead end when he was denied a means to appeal the return of his grievance without a disposition and faced with the impossible task of providing a specific remedy for prison violence as a condition for resubmission of his grievance. Morgan's grievance was as clear in its request for a remedy as any crime victim's report to the police is clear: Protect me. Hold the attacker responsible. Do what needs to be done so it does not happen again." *Ross v. Blake*, 136 S. Ct. 1850, 1854–55 (2016) (*citing* 42 U.S.C. § 1997e(a)). "Under § 1997e(a), the exhaustion requirement hinges on the ''availab[ility]' of administrative remedies: An inmate, that is, must exhaust available remedies, but need not exhaust unavailable ones." *Id.* at 1858 (Brackets in original.). This is the PLRA's "built-in exception to the exhaustion requirement[.]" *Id.* at 1855. at 1855. DOC made the grievance remedy unavailable to Morgan by creating a "dead end" for his grievance – no appeal from an impossible and unreasonable demand; and by making the grievance

process incapable of use in circumstances where an inmate is a victim of a criminal act.

### iv. Morgan's Hospitalization at BCC is Excludable Time

Mykia Cooper, a DOC Administrative Remedies Coordinator (ARC) at CCI from July 2020 through October 6, 2020, does not know and cannot testify whether Morgan's grievance was processed in accordance with AD 9.6. in 2017. (Ex. A, Cooper Dec. ¶ 3 (Doc. # 64-5)) Selena Rious ("Rious"), a DOC Correctional Counselor at BCC from January 3, 2019, until August 28, 2020, does not know and cannot testify whether BCC during the period Morgan was there in 2017 had grievance forms or an Administrative Remedies box available to hospitalized patients who were not BCC inmates. (Ex. B, Rious Dec. ¶¶ 3, 8-9 (Doc. # 64-6)) In her declaration, Rious states: "At BCC, inmates file their Level-1 grievances and grievance appeals in an administrative remedies box, which is clearly marked and accessible to all inmates." (Ex. B, Rious Dec. ¶ 8 (Doc. # 64-6)) If the AR box was available to hospitalized inmates, such as Morgan who was there for burn treatment, then it would have been located within the medical unit and not accessible or plainly visible to inmates who were not hospitalized. Without testimony about the location of the AR box showing that it was accessible to BCC hospitalized patients, a genuine issues of material fact exists whether Morgan had access to administrative remedies while he was at BCC. (Ex. 1, Morgan Dec. ¶¶ 48-50) Excluding the period of nine days that Morgan was at BCC (February 22-March 3, 2017) from the thirty-eight days between February 22 and April 10, 2017, means that Morgan did file his grievance within twenty-nine days of the assault. (Ex. 1, Morgan Dec. ¶ 57)

### C. Eighth Amendment Violations

####   i.    Failure to Protect

Morgan claims in Count One of his Amended Complaint that Watson violated the Eighth Amendment by failing to protect Morgan through deliberate indifference to Morgan's safety. Defendant Watson focuses on Morgan's statements to Watson prior to February 22, 2017, and on Morgan's statements about his relationship with his cellmate and the assault after the assault occurred to demonstrate that Watson was not sufficiently made aware of danger to Morgan or there was, in fact, no danger to Morgan.

1. According to Defendant Watson, Morgan's statements to Watson were at best "vague references  to the plaintiff feeling uncomfortable." (Defs. Mem. at pg. 13 (Doc. # 65))

2. According to Defendant Watson, Morgan's statements "after the fact" show that there were no problems or arguments with his cellmate prior to February 22, 2017. [1] (Defs. Mem. at pg. 13 (Doc. # 65))

   **(a) Watson had Notice of a Risk of Serious Harm to Morgan Based on Morgan's Reports of his Cellmate's Behavior and Watson Deliberately Ignored the Risk**

Morgan interrupted Watson during Watson's routine walk-through of the cell block days before February 22, 2017, to request a cell transfer because, as he informed Watson, his cellmate

---

[1] *See* Defs. Mem. at pgs. 13-14 ("The plaintiff alleges that he discussed the request for a change in cell for either himself or his cellmate within a few days prior to February 17, 2017. Rule 56, ¶7. Then he alleges that he filed the inmate request dated February 17, 2017. Id. However, the video evidence tells a different story. When asked by defendant Koellmer just after the incident the plaintiff vehemently denied any problems or arguments with his cellmate prior to the incident. Rule 56, ¶28-29; Exhibit G: Video CCI-VP-14-0186 at time stamp 3:54. The plaintiff further states that his cellmate was mad at someone else and took it out on him. *Id*. It is only now well after the fact that the plaintiff alleges there were possible prior issues.")

had been talking to himself about a toothbrush that his cellmate had sharpened and was threatening to use on anyone in his way. (Ex. D, Tr. 17:11-18:15 (Doc. # 64-8)) Within the contours of the cell shared by Morgan and his cellmate, it was impossible for them to avoid getting in the way of the other. (Ex. E, PDF 46 (Doc. # 64-9)) (Ex. 1, Morgan Dec. ¶ 5) Watson told Morgan that he did not move inmates for convenience. (Ex. D, Tr. 18:20-22 (Doc. # 64-8)) (Ex. 1, Morgan Dec. ¶ 8) In addition to denying Morgan's request, Watson ignored Morgan's report that his cellmate possessed contraband in the form of a dangerous instrument. The possession of a dangerous instrument in a DOC facility is a Class B felony having a maximum period of incarceration of 20 years. *See* General Statutes §§ 53a-35a(6), 53a-174a.[2] The seriousness of the crime is *prima facie* evidence of the seriousness of the risk to Morgan, other inmates, and staff and indicative of the dangerous state of mind of Morgan's cellmate. Whether or Morgan's cellmate used the sharpened toothbrush or not, the risk of harm to Morgan by any means of his cellmate's conduct was notice to Watson of a serious risk to Morgan's safety.[3]

After Morgan spoke with Watson and prior to the assault, Morgan placed an Inmate Request Form, CN 9601, in Watson's box on East Block 3. (Ex. D, Tr. 23:3-20 (Doc. # 64-8)) (Ex. 3, IRF) Morgan did not receive a response. (Ex. D, Tr. 18:21-22 (Doc. # 64-8)) Both of these efforts were Morgan's attempts to "seek informal resolution prior to filing an inmate grievance." (Ex. A, Cooper Dec. ¶ 5, attached Ex. A, AD 9.6.(6)(A) (Doc. # 64-5)) Morgan's written request

---

[2] Section 53a-174a states: "(a) A person is guilty of possession of a weapon or dangerous instrument in a correctional institution when, being an inmate of such institution, he knowingly makes, conveys from place to place or has in his possession or under his control any firearm, weapon, dangerous instrument, explosive, or any other substance or thing designed to kill, injure or disable. (b) Possession of a weapon or dangerous instrument in a correctional institution is a class B felony."

[3] For example, in Connecticut, threats that do not reference firearms still result in the seizure of firearms because, presumably, threats are indicative of intent to harm by any means available. *See* General Statutes § 29-38c.

to Watson on the IRF repeated Morgan's concerns in general but he was careful not to place anything in writing that would make a record of what other inmates would consider "snitching." (Ex. 1, Morgan Dec. ¶¶ 9-11) (Ex. 3, IRF) Morgan wrote to Watson on February 17, 2022:

> Mr Watson me & my cell mate is not getting along we had a verbal altercation and he's doing a lot of thing's that make's me feel uncomfortable I work in E3 and would like to be moved to another cell or him move thank you have a blessed day

(Ex. 3, IRF) Finally, Morgan asked a lieutenant in the facility's intelligence unit, Lt. Verdura, to speak with Watson about the cell transfer but the assault occurred on February 22, 2017, and Morgan had not heard back from Lt. Verdura. (Ex. D, Tr. 19:11-20:5 (Doc. # 64-8)) (Ex. 1, Morgan Dec. ¶ 12-13) Morgan's conversation with Lt. Verdura was one or two days before the assault. (Ex. D, Tr. 20:23-21:9 (Doc. # 64-8)) (Ex. 1, Morgan Dec. ¶ 13)

### (b) Morgan Remained Concerned about Being Labeled a "Snitch"

Defendant Watson claims that Morgan's statements just after the assault when questioned by Koellmer about what happened with his cellmate demonstrate that "[i]t is only now well after the fact that the plaintiff alleges there were possible prior issues." (Defs. Mem. at pg. 14)  Between midnight and 12:50 am on February 22, 2017, Morgan was sleeping when his cellmate threw hot water from a hot pot onto his body. (Ex. 1, Morgan Dec. ¶ 14) The first responder to the cell was Yahary. (Ex. E, Yahary Rpt. PDF 4 (Doc. # 64-9)) Morgan had just been violently attacked but when Yahary asked what was happening, Morgan said "we good, we good" because Morgan, who at the age of 34 has served 12 years in jail, was trying to avoid being known as a "snitch." (Ex. E, Yahary Rpt. PDF 4 (Doc. # 64-9)) (Ex. 1, Morgan Dec. ¶ 16) Yahary heard Morgan's cellmate say, "Get me the ---- out of here before I kill this -----." (Ex. E, Yahary Rpt. PDF 4 (Doc. # 64-9)) (Ex. 1, Morgan Dec. ¶ 17) But Morgan told Yahary, "we good, we good."

9

The next conversation Morgan had about the assault and his relationship with his cellmate was with Koellmer. Koellmer, the third shift supervisor, responded to the incident while Morgan was still in his cell. He ordered Morgan to come to the cell door. Morgan was slow because of his injuries and pain so Koellmer removed a can of mace from his waist and threatened to use it against Morgan, cursed at Morgan, demanded that Morgan turn on the lights, and forced Morgan to get dressed while the burn blisters were beginning to form and then pop under the pressure of his clothing. (Ex. 1, Morgan Dec. ¶ 18)

Koellmer told Morgan that Morgan was going to RHU for Administrative Detention pending investigation. Morgan had to request medical attention. (Ex. 1, Morgan Dec. ¶ 22) (Ex. E, Koellmer Rpt. PDF 6 (Doc. # 64-9)) No one had thought of calling for medical attention before Morgan requested it. (Ex. 1, Morgan Dec. ¶¶ 20-22) At 1:08 am, Bacchus and Padin, supervised by Koellmer, handcuffed Morgan behind his back and walked him to Medical pending Morgan's transfer to RHU, according to Lt. Koellmer. (Ex. G, Video CCI-VP-17-018 6 at 00:00-00:60 (Doc. # 64-3))[4] (Ex. E, Padin Rpt. PDF 9 (Doc. # 64-9)) (Ex. E, Bacchus Rpt. PDF 10 (Doc. # 64-9)) (Ex. E, Roman Rpts. PDF 11 and 54 (Doc. # 64-9)) (Ex. 1, Morgan Dec. ¶ 23) Morgan was in extreme pain going down the stairs on the way to Medical but knew that if made he a scene Koellmer would mace him and possibly send him to RHU without medical attention. (Ex. G, Video CCI-VP-17-018 6 at 01:10 (Doc. # 64-3))  (Ex. 1, Morgan Dec. ¶ 24) Koellmer told Morgan that he would be in RHU for one or two days and Morgan felt like he was going to break-down. (Ex. G, Video CCI-VP-17-018 6 at 05:15 (Doc. # 64-3)) (Ex. 1, Morgan Dec. ¶ 25) The handcuffs

---

[4] A summary of the six videos submitted by Defendants as Exhibits G and H and by Plaintiff as Exhibits 6 and 7 is appended to this memorandum at page 20.

created friction where Morgan had been burned. (Ex. G, Video CCI-VP-17-018 6 at 00:26, 01:25, 02:40-03:18, 05:20, 05:45 (Doc. # 64-3)) (Ex. 1, Morgan Dec. ¶ 26) A RHU Housing Status Order given to Morgan at 1:45 am on February 22, 2017, less than one hour after the assault, informed Morgan that his continued presence in the general population poses a serious threat to life, property, self, other inmates, and/or the security of the facility because: Inmate Quan Morgan #352250 placed on Administrative Detention for Pending Investigation." (Ex. E, PDF 30 (Doc. # 64-9)) Morgan had cause to distrust Koellmer's concern for his status as a victim.

Upon arrival at Medical, Koellmer interrogated Morgan about Morgan's relationship with his cellmate and had what happened in the cell. (Ex. G, Video CCI-VP-17-018 6 at 03:15 (Doc. # 64-3)) Morgan, just as he had told Yahary that everything was "good" in the cell after a pot with hot water had been thrown on him and his cellmate was threatening to kill him, told Koellmer that he had no idea that his cellmate planned to harm him and that Morgan believed he was mad at someone else. (Ex. 1, Morgan Dec. ¶¶ 28) Morgan was trying to avoid being known as a "snitch" because he had been walked through the halls of the facility and everyone knew something had happened to him so it would already be a big point of discussion whether he would "snitch" on his cellmate. (Ex. 1, Morgan Dec. ¶ 29)

Koellmer told Morgan that Medical was going to "clear" him and then he would be sent to RHU pending investigation which made Morgan anxious. (Ex. G, Video CCI-VP-17-018 6 at 04:55 (Doc. # 64-3)) (Ex. 1, Morgan Dec. ¶ 30) Morgan asked Koellmer to shut the video camera off while Morgan was being examined so Morgan could tell him what had happened to him without there being a recording of what Morgan said. (Ex. G, Video CCI-VP-17-018 6 at 06:15 (Doc. # 64-3)) (Ex. E, Roman Rpt. PDF 54 (Doc. # 64-9)) (Ex. 1, Morgan Dec. ¶ 31) After the medical examination, the plan changed from sending Morgan to RHU to transporting him to UCONN

11

Medical Center ("UCONN"). (Ex. H, Video CCI-VP-17-018 6-2 at 00:03 (Doc. # 64-3)) (Ex. 1, Morgan Dec. ¶ 32) Morgan also wrote a statement on February 22, 2017, at 11 am in the presence of Domitrz stating that Morgan did not wish to press charges. (Ex. E, Statement PDF 35 (Doc. # 64-9)) Despite Morgan's wish, the assault was prosecuted. (Ex. 4, Judicial Record of Conviction) A victim's unwillingness to come forward does not always mean that when the victim does come forward that the victim is making up allegations after the fact – especially in this case where Morgan was surrounded by inmates who viewed "snitching" as problematic, where there was no guarantee that he would be separated from the inmate who attacked him, and where Morgan had been harmed by the deliberate indifference of to his need for protection.[5] (Ex. 1, Morgan Dec. ¶ 58) (Ex. 5, Psychological Evaluation by Dr. Bruce Freedman at pg.1 ("At the time of this first interview [01/27/2022], Quan is still in the same correctional facility as the perpetrator of the assault on him. The original incident occurred on 2-22-17.).

### ii. and iii.  Excessive Force and Delay in Medical Treatment

From his cell in East Block 3 to Medical, Morgan was handcuffed in the back. (Ex. D, Tr. 32:14-18 (Doc. # 64-8)) A nurse informed Koellmer that the cuffs needed to be removed. (Ex. D, Tr. 35:11-15 (Doc. # 64-8)) The handcuffs were placed back on Morgan, but this time in front of him per the nurse's directive to avoid the rubbing that occurred when he was handcuffed behind his back, for his transfer to Admissions & Processing (AP). (Ex. D, Tr. 32:14-18 (Doc. # 64-8))

---

[5] The danger of being a "snitch" are so recognized that intimidating a witness in Connecticut is a Class B felony. *See* General Statutes § 53a-151a ("A person is guilty of intimidating a witness when, believing that an official proceeding is pending or about to be instituted, such person uses, attempts to use or threatens the use of physical force against a witness or another person with intent to (1) influence, delay or prevent the testimony of the witness in the official proceeding, or (2) induce the witness to testify falsely, withhold testimony, elude legal process summoning the witness to testify or absent himself or herself from the official proceeding.").

Muscaro and Boswell removed Morgan's handcuffs while he was strip-searched and placed the handcuffs back on his wrists over blisters with a black box to press even more against the injuries. Chains were added to secure Morgan, a seriously injured burn victim, which caused his skin to rub throughout his body by the weight of the chains which made him slump. (Ex. D, Tr. 37:1-10 (Doc. # 64-8)) Upon arrival at UCONN, the nurse told Muscaro and Boswell to take the cuffs off because they were making the injuries worse creating deep lacerations. (Ex. D, Tr. 37:15-21 (Doc. # 64-8)) They put the handcuffs right back on with the black box after the nurse left. (Ex. D, Tr. 37:22-25 (Doc. # 64-8))

When Morgan arrived back at CCI, Domitrz informed Morgan that he was going to RHU. (Ex. D, Tr. 42:11-23 (Doc. # 64-8)) Morgan's hands were cuffed behind his back. Domitrz ignored Morgan's pain as Morgan explained that the facility nurse had said earlier that day to cuff his hands in the front. (Ex. D, Tr. 43:5-12 (Doc. # 64-8)) Before taking Morgan to RHU, he went to Medical where the doctor told the officers that the cuffs should not be placed on Morgan as they were and that he was sending Morgan to the Bridgeport Correctional Center Burn Unit (BCC). (Ex. D, Tr. 43:19-25 (Doc. # 64-8)) Lt. Verdura visited Morgan in Medical. She asked Morgan, "Well, didn't he move you?" (Ex. D, Tr. 44:4-10 (Doc. # 64-8)) Again, Morgan was taken to AP to prepare for the transfer to BCC. He was undressed, searched, dressed, handcuffed in front, with the black box again bearing down on his wrists. (Ex. D, Tr. 44:23-45:3 (Doc. # 64-8))

With regard to Domitrz's conduct upon Morgan's return from UCONN, Morgan testified:

> So he was wrong for just applying the handcuffs the way that he did to me, at the time, coming back, and lying to me about an investigation, when the investigation was already done that night, when everybody spoke and said, well, the kid was sleeping. He got burnt when he was sleeping.  (Ex. D, Tr. 47:5-11 (Doc. # 64-8))

13

> So I should not have to put myself through any more pain of having
> to wear handcuffs for a walk that takes about three minutes from the
> processing room back to medical, to irritate what is going on with
> me even more. That's what I mean by that. … He [Domitrz] was
> definitely aware of it [that the handcuffs were hurting], because
> when they took them off and he put them back on, before they put
> them back on, I told him they hurt; they're giving me scars. And they
> didn't care. He just slapped them on. (Ex. D, Tr. 47:24-48:14 (Doc.
> # 64-8))

The officers had different forms of restraint available during transport. Officers who transported

Morgan from CCI to BCC did not place Morgan in the black box but instead placed him in regular

handcuffs. (Ex. D, Tr. 62:15-23 (Doc. # 64-8)) There are special handcuffs that do not have ridges

in them so they can be put on an inmate's wrists and not touch anything, but they cannot come off

the wrists. Then there are restraints that fit larger inmates that when used on smaller inmates such

as Morgan can be adjusted as needed but with less pressure. (Ex. D, Tr. 49:22; 52:6-53:3-18 (Doc.

# 64-8))

Despite the availability of a wheelchair in Medical, Morgan was walked to AP for

transport to UCONN. (Ex. H, Video CCI-VP-17-018 6-2 at 00:30 (Doc. # 64-3) He was strip-

searched at AP before transport by Muscaro and Boswell using full restraints with the black box.

(Ex. H, Video CCI-VP-17-018 6-2 at 08:12-11:20, 10:58 (Doc. # 64-3)) (Ex. E, Boswell Rpt. PDF

15 (Doc. # 64-9)) (Ex. E, Muscaro Rpt. PDF 16 (Doc. # 64-9)) UCONN discharged Morgan back

to CCI on February 22, 2017, late morning. (Ex. 1, Morgan Dec. ¶ 35) Even after a nurse at

UCONN advised Muscaro and Boswell that the black-box restraint was dangerous to Morgan's

medical condition and it was removed during the examination, Morgan was restrained again in

that manner for the transport back to CCI. Immediately upon Morgan's return to CCI, Domitrz

informed Morgan that he was going to RHU pending investigation. (Ex. 6, DOC Video at 00:40)

(Ex. E, Domitrz Rpt. PDF 8 (Doc. # 64-9)) Morgan was again paraded through CCI on the way to

14

Medical, handcuffed with injuries while other inmates who were not handcuffed or otherwise restrained watched Morgan's vulnerable and injured condition. (Ex. 6, DOC Video at 01:40, 03:40) Medical had a wheelchair available. (Ex. 6, DOC Video at 04:10) When Morgan arrived at Medical, he knew he looked bad because of the shocked look on the nurse's face. (Ex. 6, DOC Video at 04:03) When the medical examination began and as the video camera was turned off, Domitrz stated that Morgan would be placed in RHU following the examination pending investigation. (Ex. 6, DOC Video at 04:18) As Jones and Howard placed Morgan in handcuffs at the end of an approximate 30-minute medical examination, the plan changed from sending Morgan to RHU to transporting him to the Medical Burn Unit at Bridgeport Correctional (BCC) for treatment. (Ex. 7, DOC Video at 00:16) (Ex. E, Nogueira Rpt. PDF 19 (Doc. # 64-9)) Morgan was then paraded through CCI in handcuffs by Jones and Howard under the supervision of Lt. Domitrz from Medical to AP where he undressed, complied with a strip-search, and dressed. (Ex. 7, DOC Video at 00:01-03:36))

### v. Watson's, Koellmer's and Domitrz's Conduct was Extreme and Outrageous[6]

Watson, a DOC supervisor and captain, failed to act and ignored information provided to him by Morgan that another inmate, Morgan's cellmate, possessed a dangerous instrument that could harm Morgan, other inmates, and staff. Watson ignored Morgan's reports that his cellmate was making Morgan uncomfortable and threatening to stab others. The gravamen of Morgan's

---

[6] Plaintiff does bring his claim of Intentional Infliction of Emotional Distress in Count Five as a state law claim, not pursuant to 42 U.S.C. § 1983.

reports to Watson was that Morgan's cellmate was dangerous, especially to Morgan who shared a cell with him.

Regarding Koellmer and Domitrz, despite Morgan's obvious pain, shock, and injuries they continued to tell Morgan that he would be going to RHU. Instead of just waiting for medical opinions, they intentionally and maliciously made an injured victim believe that he would be placed in an isolated cell with his injuries and unable to have contact with his family during this time when he needed support. Koellmer never considered calling for medical attention. Koellmer and Domitrz never considered contacting Medical for a wheelchair. Morgan was paraded through the facility in a vulnerable state in a setting where it presents a risk to life and health to be seen as vulnerable.

In nearly every context the conduct of the Defendants would be considered extreme and outrageous. Violence between Morgan and his cellmate, because they reside together, would be considered acts of domestic violence were the violence to occur in the general population outside DOC. Applying the treatment Morgan received after his assault to a domestic violence victim in the general population, this scenario is analogous: Morgan complains to the police that his housemate is threatening him with a dangerous instrument. The police do not respond. Morgan sends a note asking for help in getting away from his housemate. The police do not respond. Morgan's housemate throws a pot of hot water on him. Police respond to reports of a disturbance at the residence Morgan shares with his housemate. The police supervisor observes only a superficial laceration even though other officers can see the burns on Morgan's body. (Ex. E, Photos of Morgan PDF 37-45, 48-52 (Doc. # 64-9)) (Ex. E, Roman Rpt. PDF 11) An ambulance is not called. The police tell Morgan prior to a trip to the hospital and after his return pending medical examination that he will be locked up in RHU even as Morgan's medical status has yet to

be determined.[7] Morgan's traumatic reaction and lingering post-traumatic stress disorder are worse because of two important factors: the lack of response or protection when the danger from Mr. Morgan's roommate was first reported, and the punitive, physically, harsh handling of his injuries after the attack." Ex. 5, Psychological Evaluation by Dr. Bruce Freedman at pg. 8)

### D.  Qualified Immunity

Watson's failure to respond to Morgan's verbal and written reports of the risk of immediate danger imposed by Morgan's cellmate and Morgan's report of his cellmate's continued commission of a felony violate clearly established law. The Supreme Court, in *Farmer v. Brennan*, 511 U.S. 825, 832 (1994), "clearly established that the Eighth Amendment imposes a duty on prison officials to provide humane conditions and to take measures to insure the safety of inmates." *Rodriguez v. Connecticut*, 169 F. Supp. 2d 39, 48 (D. Conn. 2001) Separate from the law clearly establishing in *Farmer* a correctional officer's duty to ensure the safety of inmates, the duty in Connecticut is clearly established in statutory law.  General Statutes § 54-1f imposes the following clearly established duty upon peace officers:

> Peace officers, as defined in subdivision (9) of section 53a-3, in their respective precincts, shall arrest, without previous complaint and warrant, any person for any offense in their jurisdiction, when the person is taken or apprehended in the act or on the speedy information of others …

The statutory definition of a peace officer includes "an official of the Department of Correction authorized by the Commissioner of Correction to make arrests in a correctional institution or facility … ." General Statutes § 53a-3(9). Even if the Commissioner had not authorized Watson to

---

[7] This is not intended to challenge DOC's authority to maintain custody of Morgan but to address Koellmer's and Domitrz's continued presumption as communicated to Morgan, that, despite his serious injuries, Morgan would be placed in RHU.

make arrests, he had a duty to report the information provided by Morgan to the Commissioner or other law enforcement with the power to make felony arrests.

The duty in *Farmer* which clearly establishes the Eighth Amendment duty to provide humane conditions and to ensure the safety of inmates was violated by Defendants during the treatment Morgan received after his assault:

> Awakening from a sound asleep in the dark, with intense pain, physical disorientation, still under attack, create a stark, terrifying experience for Mr. Morgan. Once the immediate danger to him was removed, Mr. Morgan was faced with the reality of the simplicity through which the attack could have been prevented. He was painfully aware that, contrary to his well-founded request for protection being heeded, he was threatened and intimidated into having no protective action taken on his behalf. From the time Mr. Morgan managed to restrain his attacker, correctional staff responded to the attack without any concern or medically sound response to Quan's injuries. No medical staff were summoned, large areas of burned skin were further damaged by the use of metal restraints and demands for movement, and only the eventual intervention of the prison doctor steered him in the direction of appropriate medical help at a specialized burn unit.
> ☐

(Ex. 5, Dr. Freedman Report at pg. 8.)

**V.      CONCLUSION**

For the foregoing reasons, Plaintiff respectfully opposes summary,  and asks that the Court

deny summary judgment, for Defendants (1) Capt. Watson; (2) Lt. Koellmer; (3) Lt. Domitrz; (4)

Ofc. Padin; (5) Ofc. Bacchus; (6) Off. Boswell; and (7) Off. Muscaro.

<div style="margin-left:40%">

*Respectfully submitted*,
PLAINITFF
QUAN MORGAN

By:

Rachel M. Baird
Attorney Rachel M. Baird
2234 Silas Deane Highway, Suite 2
Rocky Hill, CT 06067
Tel: 860-605-9340
Fax: 860-785-8733
rbaird@rachelbairdlaw.com

</div>

19

## SUMMARY OF VIDEOS

---

**Video #1**    (1:08 am) (Defendants Ex. G)
(File name CCI-VP-17-018 6)
Length 7 min. 1 sec.
COs respond to Quan's cell
Quan escorted from cell to CCI medical.

---

**Video #2**    (1:32 am) (Defendants Ex. G)
(File name CCI-VP-17-018 6-2)
Length 18 min. 48 sec.
Quan escorted from CCI medical to AP for transport to UCONN

---

**Video #3**    (10:49 am) (Defendants Ex. H) (Plaintiff Ex. 6)
(File name 003)
Length 4 min. 23 sec.
Quan returns from UCONN, escorted to CCI medical (with intent to place Quan in segregation pending investigation at this time)

---

**Video #4**    (11:27 am) (Defendants Ex. H) (Plaintiff Ex. 7)
(File name 004)
Length 3 min. 36 sec
CCI Medical Unit to AP for transport to Bridgeport Burn Unit

---

**Video #5**    Camera Battery Issue (Defendants Ex. H)
(File name 005)
Length 1 sec.

---

**Video #6**    (11:32 am) (Defendants Ex. H)
(File name 006)
Length 43 sec.
In AP waiting for transport to Bridgeport

## **<u>SERVICE</u>**

In accordance with Local Civil Rule 5(c), service is made on all parties through the court's CM/ECF system. The transmission notice on the Notice of Electronic Filing shall be deemed a sufficient certificate of service.