## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| **MORGAN**, | : |
|     Plaintiff, | : |
| | :  CASE NO.: 3:20-cv-00254-JBA |
| v. | : |
| | : |
| **WATSON, ET AL.**, | : |
|     Defendants. | :  OCTOBER 6, 2022 |

### DECLARATION OF QUAN MORGAN

I, Quan Morgan, hereby depose based on my knowledge, information and belief under penalty of perjury:

1. I am an adult held in the custody of the Connecticut Department of Correction (DOC) continuously since May 23, 2010.

2. The DOC transferred me to Cheshire Correctional Institution (CCI) at the end of 2014 where I remained until DOC transferred me to McDougall Correctional Institution during summer 2015.

3. I returned to CCI in 2016 and was initially housed in East Block 2 until I obtained a job and was moved to East Block 3 in a cell with Inmate Julian Bennett ("Bennett") in January 2017.

4. While housed with Bennett, I observed him sharpening a toothbrush on the window screen of the cell. Bennett stated that he would stab anyone who annoyed him.

5. I looked at PDF pages 46 and 47 of Defendants' Exhibit E [Doc. # 64-9] and confirm that they are accurate pictures of the cell that Bennett and I shared.

6. I reported to Captain Watson ("Capt. Watson") that Bennett had a sharpened toothbrush and expressed fear for my safety because Bennett was talking to himself, threatening others, and had a sharpened toothbrush.

1

7. Capt. Watson threatened to send me to the Restricted Housing Unit (RHU), which is referred to also as "seg" or "segregation," where visits and phone calls with family are prohibited.

8. Capt. Watson told me that my offense would be refusing housing and that he did not move inmates for convenience.

9. I then submitted an Inmate Request Form on or about February 17, 2017, to Capt. Watson repeating my concerns in general while being careful not to place anything in writing that would make a record of what other inmates would consider "snitching." (Pl. Mem. Ex. 3, IRF)

10. I did not want Bennett to find out that I had told Capt. Watson about the sharpened toothbrush especially since I was still in the same cell as Bennet and he could hurt me.

11. My written request to Capt. Watson on February 17, 2017, that he never answered stated:

> Mr Watson me & my cell mate is not getting along we had a verbal altercation and he's doing a lot of thing's that make's me feel uncomfortable I work in E3 and would like to be moved to another cell or him move thank you have a blessed day

(Pl. Mem. Ex. 3, IRF)

12. I spoke to Lt. Verdura who was a correctional officer (CO) at CCI in the intelligence unit and my conversation with her made me feel that she was going to speak with Capt. Watson to attempt to resolve the situation. (Ex. D, Tr. 20:11-21:4 (Doc. # 64-8))

13. My conversation with Lt. Verdura was one or two days before Bennett attacked me. (Ex. D, Tr. 20:23-21:9 (Doc. # 64-8))

14. Between midnight and 12:50 am on February 22, 2017, I was sleeping and Bennett threw hot water from a hot pot on my body.

15. The first responder to the cell was Correctional Officer ("CO") Yahary. (Ex. E, Yahary Rpt. PDF 4 (Doc. # 64-9))

16. I told CO Yahary that "we good, we good" because I was trying to avoid being known as a "snitch." (Ex. E, Yahary Rpt. PDF 4 (Doc. # 64-9))

17. I heard Bennett tell the COs to open the cell or he was going to kill me.

18. Lt. Koellmer ordered me to come to the cell door but I was slow because of my injuries and pain so he removed a can of mace from his waist and threatened to use it against me, cursed at me, and demanded that I turn on the lights, and forced me to get dressed while the burn blisters were beginning to form and then pop under the pressure

19. I did not think I could put clothes over my skin due to my injuries but when Lt. Koellmer threatened to mace me I struggled to put on my clothes before I was handcuffed.

20. Lt. Koellmer, the East Sector 3rd shift supervisor, failed to assess my injuries despite knowing that a pot of hot water had been thrown on me. He reported that he only saw a superficial laceration above my left eyebrow. (Ex. E, Koellmer Rpt. PDF 6 (Doc. # 64-9))

21. Lt. Koellmer did not call for medical attention.

22. Lt. Koellmer told me that I was going to RHU. I had to request medical attention. (Ex. E, Rpt. PDF 6 (Doc. # 64-9))

23. At 1:08 am, CO Bacchus and CO Padin, supervised by Lt. Koellmer, handcuffed me behind my back and walked me to the medical unit pending my transfer to RHU, according to Lt. Koellmer. (Ex. G, Video CCI-VP-17-018 6 at 00:00-00:60 (Doc. # 64-3)) (Ex. E, Padin Rpt. PDF 9 (Doc. # 64-9)) (Ex. E, Bacchus Rpt. PDF 10 (Doc. # 64-9)) (Ex. E, Roman Rpts. at PDF 11 and 54 (Doc. # 64-9))

24. I was in extreme pain going down the stairs on the way to the medical unit but knew that if I made a scene Lt. Koellmer would mace me and possibly sent me to RHU without medical attention. (Ex. G, Video CCI-VP-17-018 6 at 01:10 (Doc. # 64-3))

25. Lt. Koellmer told me I would be in RHU for one or two days and I felt like I was going to break-down. (Ex. G, Video CCI-VP-17-018 6 at 05:15 (Doc. # 64-3))

26. The handcuffs created friction where I had been burned. (Ex. G, Video CCI-VP-17-018 6 at 00:26, 01:25, 02:40-03:18, 05:20, 05:45 (Doc. # 64-3))

27. Upon arrival at the medical unit, Lt. Koellmer interrogated me about what happened in the cell. (Ex. G, Video CCI-VP-17-018 6 at 03:15 (Doc. # 64-3))

28. I told Lt. Koellmer that I had no idea Bennett planned to harm me and that Bennett was mad at someone else.

29. I was trying to avoid being known as a "snitch" because I had been walked through the halls of the facility and everyone knew something had happened to me so it would already be a big point of discussion whether I would "snitch" on Bennett.

30. Lt. Koellmer told me that the Medical Unit ("Medical") was going to "clear me" and then I would be sent to RHU pending investigation which made me anxious. (Ex. G, Video CCI-VP-17-018 6 at 04:55 (Doc. # 64-3))

31. I asked Lt. Koellmer to shut the video camera off while I was being examined so I could tell him what had happened to me without there being a recording of what I said. (Ex. G, Video CCI-VP-17-018 6 at 06:15 (Doc. # 64-3)) (Ex. E, Roman Rpt. PDF 54 (Doc. # 64-9))

32. After the medical examination, the plan changed from sending me to RHU to transporting me to UCONN Medical Center ("UCONN"). (Ex. H, Video CCI-VP-17-018 6-2 at 00:03 (Doc. # 64-3))

33. Despite the availability of a wheelchair in Medical, I was walked to Admissions and Processing ("AP") for transport. (Ex. H, Video CCI-VP-17-018 6-2 at 00:30 (Doc. # 64-3))

34. I was strip-searched at AP then transported by CO Muscaro and CO Boswell using full restraint with the black box. (Ex. H, Video CCI-VP-17-018 6-2 at 08:12-11:20, 10:58 (Doc. # 64-3)) (Ex. E, Boswell Rpt. PDF 15 (Doc. # 64-9)) (Ex. E, Muscaro Rpt. PDF 16 (Doc. # 64-9))

35. UCONN discharged me back to CCI on February 22, 2017, late morning.

36. Even after a nurse at UCONN advised CO Muscaro and CO Boswell that the black-box restraint was dangerous to my medical condition and it was removed during the examination, I was restrained again in that manner for the transport back to CCI.

37. Immediately upon my return to CCI, Lt. Domitrz informed me that I was going to RHU pending investigation. (Ex. 6, Video 00:40) (Ex. E, Domitrz Rpt. PDF 8 (Doc. # 64-9))

38. I was again paraded through the facility on the way to Medical handcuffed with injuries while other inmates who were not handcuffed or otherwise restrained watched me in a vulnerable and injured condition. (Ex. 6, Video 01:40, 03:40)

39. Medical had a wheelchair available. (Ex. 6, Video 04:10)

40. When I arrived at Medical, I knew I looked bad because of the shocked look on the nurse's face. (Ex. 6, Video 04:03)

41. When the medical examination began and as the video camera was turned off, Lt. Domitrz stated that I would be placed in RHU following the examination pending investigation. (Ex. 6, Video 04:18)

42. As CO Jones and CO Howard placed me in handcuffs at the end of an approximate 30-minute medical examination, the plan changed from sending me to RHU to transporting me to the Medical Burn Unit at Bridgeport Correctional (BCC) for treatment. (Ex. 7, Video 01:40, 03:40) (Ex. 7, Video 00:16) (Ex. E, Nogueira Rpt. PDF 19 (Doc. # 64-9))

43. Due to the extent of my injuries, the DOC physician in Medical, Dr. Ruiz, said that I was to be transferred to BCC.

44. I was then paraded through the facility in handcuffs by CO Jones and CO Howard under the supervision of Lt. Domitrz from Medical to AP where I undressed, complied with a strip-search, and dressed before being restrained in a black box for the trip to BCC. (Ex. 7, Video 03:36 in length)

45. I stayed at BCC for approximately three weeks where I received Tylenol pain medication for my 1st and 2nd degree burns on my head, hands, back, torso, arms, face, and ears.

46. During my stay at BCC, I requested mental health counseling and saw someone 2-3 times for a total of less than 5 minutes.

47. I developed PTSD and was in severe pain during the three-weeks at BCC. (Ex. 5, Dr. Freedman Report at pg. 8)

48. I returned to CCI and was concerned for my safety which caused me not to sleep and to be super-vigilant to any movement around me.

49. At no time from the time of my injuries to my return to CCI from BCC did I receive any counseling or an accommodation related to filing a grievance.

50. At no time while I was at BCC did I see an Administrative Remedies box nor was I in a mental or physical condition capable of requesting or completing a grievance and no one offered me a form or offered to assist me in submitting a grievance.

51. I looked at an exhibit to an October 6, 2020, declaration by Mykia Cooper. (Ex. A, Cooper Dec., attached Ex. D (Doc. # 64-5))

52. The second page of Exhibit D to the Cooper Declaration is my statement which I signed and submitted in my second attempt to file a grievance about the assault and my injuries. I mention

in my statement that this was a second attempt to file a grievance. (Ex. A, Cooper Dec., attached Ex. D at pg. 2 (Doc. # 64-5))

53. The third page of Exhibit D to the Cooper Declaration is the cover page for my second grievance. (Ex. A, Cooper Dec., attached Ex. D at pg. 3 (Doc. # 64-5))

54. Prior to my second attempt to file a grievance, I filed a grievance attaching the Inmate Request Form that I had submitted to Capt. Watson on February 17, 2017. (Ex. 2, First Grievance) (Ex. 3, IRF)

55. I initially filed my first grievance with Medical.

56. Medical returned the grievance to me and I then put it in the administrative remedies box.

57. I made a copy of my first attempt to file a grievance for my records and I never received a response. Ex. 2, First Grievance)

58. While I was at Garner Correctional Institution, Bennet was there also and I could have run into him at any time.

_____
Quan Morgan

Signed and sworn to under penalty of perjury on October 6, 2022, in Cheshire, Connecticut.

_____
Rachel M. Baird
Commissioner of the Superior Court
CT JURIS No. 407222