UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | |
|---|---|
| QUAN MORGAN<br><br>  *Plaintiff*,<br><br>  *v.*<br><br>CAPTAIN WATSON, LIEUTENANT KOELLMER, LIEUTENANT DOMITRZ, OFFICER PADIN, OFFICER BACCHUS, OFFICER BOSWELL, and OFFICER MUSCARO,<br><br>  *Defendants.* | Civil No. 3:20-CV-00254<br><br>December 29, 2022 |

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

  Plaintiff Quan Morgan is an inmate in the custody of the Connecticut Department of Corrections ("DOC") who was attacked with boiling water by his then cellmate at 12:45 AM on February 22, 2017, sustaining severe burns and scarring. Plaintiff alleges that the Defendant DOC officers' actions before and after the attack violated his Eighth Amendment rights and constituted intentional infliction of emotional distress. Specifically, Plaintiff's Amended Complaint [Doc. # 41] alleges that Captain Watson was deliberately indifferent in his refusal to move Plaintiff to another cell after Plaintiff requested the transfer, explaining that his cellmate was acting in a threatening manner (Count One); Defendants Koellmer and Domitrz used excessive force on Plaintiff by continuing to cuff his burned wrists and were deliberately indifferent to his serious medical needs (Count Two); Defendants Koellmer and Domitrz caused Plaintiff's injuries through their negligent supervision (Count Three); Defendants Padin, Bacchus, Boswell, and Muscaro used excessive force against Plaintiff and

1

were deliberately indifferent to his serious medical needs (Count Four); and all Defendants intentionally inflicted emotional distress on Plaintiff (Count Five).[1]

Defendants moved for summary judgment on all claims [Doc. # 42]. For the reasons given below, the Court DENIES Defendants' motion for summary judgment on Count One and Count 5 and GRANTS summary judgment on Counts Two, Three, and Four.

## I. Background

### A. Events Leading Up to the Attack on Plaintiff

From December 7, 2016 to February 22, 2017, Plaintiff was housed at the Cheshire Correctional Institution ("CCI"). (Defs.' Loc. R. 56(a)(1) Stmt. [Doc. # 64-2] ¶ 1.) A few weeks before February 22nd, Plaintiff was placed in a cell with Julian Bennett. (*Id.* ¶ 5.) A few days before the 22nd, Plaintiff states that he stopped Captain Watson during Watson's routine walk-through of the cell block and requested that he be transferred away from Mr. Bennett. (Pl.'s Loc. R. 56(a)(1) Stmt. [Doc. # 69-1] ¶ 1.) Plaintiff told him that he was afraid of Mr. Bennett because Mr. Bennett was sharpening a toothbrush into a weapon, was threatening to stab "whoever gets in his way," and was talking to himself. (Morgan Dep. [Doc. # 64-8] at 17-18.) Defendant Watson replied that he didn't "do convenience moves" and refused Plaintiff's request. (*Id.* at 18.) Plaintiff states that on February 17, 2019, he filed a written CN 9601 request, a form used to request an informal resolution of an issue, with Defendant Watson stating that he was not getting along with his cellmate, that they had had a verbal altercation, that Bennet was "doing a lot of things that make [him] feel uncomfortable," and that Plaintiff would like one of them to be moved to another cell. (Morgan Dep. at 17; CN 9601 [Doc. # 69-4].) The request was neither answered nor returned. (Defs.' Loc. R. 56(a)(1) Stmt. ¶ 9.)

### B. Attack on Plaintiff and Immediate Aftermath

---

[1] Plaintiff's Amended Complaint also named Defendants Hernandez, Yahary, Mateo, Klingenberg, Howard, Jones, Nogueira, and Bugbee, but Plaintiff has abandoned these claims.

At approximately one o'clock in the morning of February 22, 2017, Mr. Bennett heated water in a hot pot and threw boiling water on Plaintiff while he slept. (Defs.' Loc. R. 56(a)(1) Stmt. ¶ 11.) Plaintiff sustained first, second, and third-degree burns. (Morgan Dep. at 26-29, 33.) At this point, Plaintiff's and Defendants' accounts diverge significantly.

Plaintiff states that after this attack, he jumped out of bed and began screaming. (Morgan Dep. at 26.) He describes himself as in shock and "covered in blood" and burn blisters (Morgan Dep. at 26-29.) Photos from shortly after the attack also show large, bloody wounds, visible burn blisters, and peeling skin. (Incident Report [Doc. # 64-9] at 37-45, 51.) Plaintiff reports that Officer Yahary came to respond and asked what the issue was. (Defs.' Loc. R. 56(a)(1) Stmt. ¶ 16.) Mr. Bennett was then taken to the day room. (*Id.* ¶ 17.) Then, Defendants Koellmer, Bacchus, and Padin responded to the scene. (*Id.* ¶ 21.) Defendant Koellmer ordered Plaintiff to come to the door, but Plaintiff had to move slowly because of his injuries. (Morgan Decl. ¶ 18.) Defendant Koellmer then threatened to mace him, made him turn on the lights, and made him get dressed, which popped the burn blisters. (*Id.*) Plaintiff alleges that when the lights were on, the extent of Plaintiff's injuries was apparent to Defendant Koellmer. (Morgan Dep. at 31-32.) Plaintiff requested medical attention, but Defendant Koellmer did not call for any. (*Id.*) Instead, Defendants Bacchus and Padin handcuffed Plaintiff's hands behind his back, and Defendant Koellmer said he was going to send Plaintiff to the Restricted Housing Unit (RHU).[2] (*Id.* at 31.; Morgan Decl. ¶ 23.) However, as Plaintiff was standing outside his cell, the plan changed and he was made to walk, while cuffed, to Medical. (Morgan Dep. at 31-21.)

Defendants, however, allege that the officers heard "loud arguing" in the cell and found Plaintiff and Mr. Bennett arguing. (Defs.' Loc. R. 56(a)(1) Stmt. ¶ 15.) Defendants allege that Defendant Koellmer then interviewed both Plaintiff and Mr. Bennett before making

---

[2] The RHU, also called "seg" or "segregation" is an area of the prison where, among other restrictions, visits and calls with family are prohibited. (Morgan. Decl. ¶ 7.)

Plaintiff dress and restraining Plaintiff. (*Id.* ¶ 22.) Defendants' incident report also alleges that Defendant Koellmer saw only a "superficial laceration" on Plaintiff's face. (Defs.' Loc. R. 56(a)(1) Stmt. ¶ 23.)

Video taken by corrections officers shows Plaintiff being taken from his cell to Medical. [Cell to CCI Video [Doc. # 69-7].) Once at Medical, Defendant Koellmer began questioning Plaintiff, who said that he had been asleep but was awakened when the hot water was poured on him. (*Id.* at 3:37). He also said that he and Mr. Bennet had not had problems earlier, but that Mr. Bennett went crazy, taking out his anger at someone else out on Plaintiff. (*Id.* at 4:10.)

In Medical, a nurse said that the cuffs had to be removed because they were "irritating" Plaintiff's wounds. (Morgan Dep. at 32.) Defendant Koellmer refused to let the cuffs be removed. (*Id.* at 32-33.) The cuffs were eventually removed so Plaintiff could be examined by the nurses. (*Id.* at 35.) Once the examination finished, Plaintiff was cuffed again. (Morgan Dep. at 35.) This time, the cuffs were placed in front of him to reduce rubbing on his skin. (*Id.* at 36.)

The nurse then called a doctor, who said that Plaintiff would have to go to the University of Connecticut hospital ("UConn"). Plaintiff was brought to the property room, strip-searched, and re-dressed by Defendants Bacchus and Padin, under Defendant Koellmer's supervision, and handcuffed with "black box" handcuffs, which permit less movement than regular cuffs, exacerbating the rubbing on his burned skin. (Morgan Dep. at 36-37.) Plaintiff was transported to UConn by Defendants Boswell and Muscaro. (*Id.* at 51-52.) After he arrived, a nurse instructed Defendants that the cuffs had to be removed because they were exacerbating Plaintiff's injuries. (*Id.* at 37.) After Defendants removed the cuffs, the nurse bandaged his wrists. (*Id.*). However, Defendants replaced the cuffs as soon as the nurse left the room. (*Id.*) Despite the application of pain medication, Plaintiff felt as if his skin was "on fire." (*Id.* at 40.) Plaintiff was discharged a few hours later. (*Id.* at 41.)

After discharge, Plaintiff was transported back to CCI by Defendants Boswell and Muscaro, in the black box cuffs. (*Id.* at 42.) Defendant Domitrz was there when Plaintiff arrived and said that Plaintiff was going to RHU. (*Id.* at 42.) Defendant Domitrz then cuffed Plaintiff's arms behind his back, despite Plaintiff telling him that the nurse had said to cuff him with hands in front of him. (*Id.* at 43.) Nonetheless, Plaintiff was walked to Medical without change to his cuffing position. (*Id.*) The doctor immediately said that Plaintiff was not supposed to be cuffed with his hands behind him, and that UConn said Plaintiff should be in a burn unit, meaning he could not safely be sent to RHU. (*Id.* at 43-45.) He was then transported to the Bridgeport Correctional Center ("BCC"), where there is a hospital unit. (*Id.* at 43-45.)

### C. Events Following the Attack

Approximately a week and a half later, on March 3, 2017, Plaintiff was transferred back to CCI. (Cooper Decl. [Doc. # 64-5] ¶ 10; Morgan Decl. ¶ 49). Here Plaintiff's and Defendants' accounts again diverge. Plaintiff states that at some point before April 10, 2017, he submitted a grievance stating that Mr. Bennett had seriously injured him, that Mr. Bennett was not supposed to be sharing a cell, and that Captain Watson had denied his request to be moved. (Morgan Decl. ¶ 52, 52-56; Undated Grievance [Doc. # 69-3].) Plaintiff attached a copy of his pre-attack CN 9601 and asked for a new policy governing the placement of inmates with each other. (Undated Grievance.) Defendants maintain that there is no grievance log record of any grievance filed by Plaintiff at BCC or CCI prior to April 10, 2017. (Defs.' Loc. R. 56(a)(1) Stmt. ¶ 41, 44.)

The parties do agree that Plaintiff filed a grievance on April 10, 2017, restating claims made in his first grievance and stating that "this is the 2nd grievance I filed. . . because I didn't hear anything from the 1st one." (*Id.* ¶ 39; Morgan Decl. ¶ 52-53; April 10, 2017 Grievance [Doc. # 64-5] at PDF 36.) The grievance was "returned without disposition" on May 9, 2017 (April 10, 2017 Grievance at PDF 35.) The administrative form contains a list of reasons for

5

returning a grievance without disposition, but none were checked; there was only a comment that "your level one grievance is being returned to you without disposition. Please specify the action that you think should be taken to resolve the issue you are discussing." (*Id.*)

### D. Types of Restraints Used

There are four types of cuffs that DOC Corrections officers can use to transport prisoners outside of a facility. (Morgan Dep. at 55.) The most restrictive is the black box cuffs, for which a black plastic box creates a fixed connection between the cuffs, meaning that there is no wrist movement possible. (*Id.* at 56.) The next less-restrictive option is cuffs connected by a chain with another chain around the waist, which allows more movement. (*Id.*) Regular cuffs without the waist chain allow still more movement.[3] (*Id.*) The least restrictive option is plastic cuffs. (*Id.* at 56.) The nurse at UConn told Defendants Boswell and Muscaro to use the plastic cuffs on Plaintiff, but they did not. (*Id.* at 52-53.)

## II. Standard

Summary judgment is appropriate if, "assess[ing] the record in the light most favorable to the non-movant and [and] draw[ing] all reasonable inferences in the non-movant's favor," "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000)[4]. There is a genuine dispute of material fact if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The initial burden of showing that there is no genuine dispute of material fact rests with the moving party. *Weinstock*, 224 F.3d at 41. Once that showing is made, the non-moving party must "come forward with materials . . . setting forth specific

---

[3] This kind was used when Plaintiff was transported from CCI to BCC. (Morgan Dep. at 60.)
[4] Unless otherwise indicated, this opinion omits internal quotation marks, alterations, citations, and footnotes in text quoted from court decisions.

6

facts showing that there is a genuine issue of material fact to be tried." *Gottlieb v. Cnty. of Orange*, 84 F.3d 511, 518 (2d Cir. 1996). Summary judgment will only be granted if "taking all of plaintiffs' evidence as true, . . . no reasonable juror" could rule in Plaintiff's favor. *Amnesty Am. V. Town of W. Hartford*, 361 F.3d 113, 122 (2d Cir. 2004).

### III. Discussion

#### A. § 1983 Claims

##### 1. Administrative Exhaustion

The Prison Litigation Reform Act ("PLRA") requires that prisoners exhaust "such administrative remedies as are available" before bringing suit under § 1983. 42 U.S.C. § 1997e(a). However, exhaustion is not required if "an administrative remedy, although officially on the books, is not capable of use to obtain relief." *See Ross v. Blake*, 136 S. Ct. 1850, 1859 (2016). This is the case "when: (1) the grievance process operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates; (2) the process is so opaque that it becomes, practically speaking, incapable of use; or (3) prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Rucker v. Giffen*, 997 F.3d 88 (2d Cir. 2021). Exhaustion is a question of law that must be decided by the Court, not by a jury. *Messa v. Goord*, 652 F.3d 305, 308-310 (2d Cir. 2011).

Connecticut's administrative remedy for grievances is set forth in Administrative Directive 9.6[5] ("A.D. 9.6"), under which prisoners must first "seek informal resolution prior to filing a grievance," either "verbally with the appropriate staff member . . . [or by] submit[ting] a CN 9601, Inmate Request Form." State of Conn. Dep't of Corrections, Admin. Directive 9.6.6(a)(i)(2)-(3) (effective Aug. 15, 2013). If the issue is not resolved within 15

---

[5] A new version was promulgated in 2021. State of Conn. Dep't of Corrections, Admin. Directive 9.6.6(a)(i)(2)-(3) (effective April 20, 2021). The incidents involved in this case took place in 2017, so the Court looks to the 2013 version of the administrative directive.

7

business days after submission of a CN 9601, the inmate may submit a formal level one grievance to the prison's administrative body. A.D. 9.6.6(a)(i)(8). The level one grievance must be submitted "within 30 calendar days of the occurrence or discovery of the cause of the grievance."

Defendants argue that Plaintiff failed to exhaust his administrative remedies with regard to Counts Two, Three, and Four, which are based on Defendants' responses to the attack on Plaintiff.[6] (Defs.' Mem. [Doc. # 64-1] at 5-9.) The Court has previously held that by returning Plaintiff's April 10 grievance to him without specifying the reason for its rejection, the prison effectively cut Plaintiff off from any continuing administrative process, creating a dead end from which he had no practical way of obtaining relief. (Order Denying Mot. to Dismiss [Doc. # 48] at 6.) However, Defendants argue that Plaintiff nonetheless failed to exhaust his remedies because his grievance does not mention his claims in Counts Two through Four, instead focusing only on Defendant Watson's failure to move him from his cell before the attack. (*Id.* at 8-11.) Further, Defendants argue that if Plaintiff's grievance can be construed as applying to Counts Two through Four, it was untimely submitted, more than 30 days after the attack. (*Id.*) Plaintiff argues that he "considered [his treatment by other officers after the attack] part of Watson's failure to protect him," did timely submit a grievance, and that by failing to specify the reason for rejecting the grievance, the prison failed to follow its own procedures, creating an administrative dead end, so the PLRA exhaustion requirement does not apply to Plaintiff's claims. (Pl.'s Opp'n [Doc. # 69] at 2-6.)

For the purpose of the PLRA, the administrative process is only exhausted with regard to the issues specified in the grievance. *See Ortiz v. McBride*, 380 F.3d 649, 653-54 (2d Cir. 2004) (finding that plaintiff had exhausted the administrative process with respect to his due process claim, but not with respect to his Eighth Amendment claim, about which he did

---

[6] The Court previously ruled that Plaintiff had exhausted his administrative remedies as to Count One. (Order Denying Mot. to Dismiss. [Doc. # 48].)

8

not pursue a grievance). Neither Plaintiff's April 10 grievance nor his claimed first grievance can be reasonably understood to extend to the conduct of Defendant officers in response to the attack on Plaintiff. The only officer named is Defendant Watson, and there is no reference to any events that occurred after the attack on Plaintiff. (Undated Grievance; April 10, 2017 Grievance.) Plaintiff has therefore not exhausted his claims with regard to Counts Two to Four.

### 2. Failure to Protect Directed to Defendant Watson

Plaintiff's remaining, exhausted constitutional claim is his failure to protect claim against Defendant Watson. The test for failure to protect, also referred to as deliberate indifference by parties, in violation of the Eighth Amendment is twofold.

> First, the plaintiff must demonstrate that he is incarcerated under conditions posing a substantial risk of serious harm. Second, the plaintiff must demonstrate that the defendant prison officials possessed sufficient culpable intent. The second prong of the deliberate indifference test, culpable intent, in turn, involves a two-tier inquiry. Specifically, a prison official has sufficient culpable intent if he has knowledge that an inmate faces a substantial risk of serious harm and he disregards that risk by failing to take reasonable measures to abate the harm."

*Hayes v. N.Y. City Dep't of Corrections*, 84 F.3d 614, 620 (2d Cir. 1996). Defendants maintain that Plaintiff's claim Defendant Watson failed to protect him from Mr. Bennett is contradicted by Plaintiff's statements to Defendant Koellmer immediately after the fact that Plaintiff didn't have any problems with Mr. Bennett, who was angry with someone else and taking it out on Plaintiff. (Defs.' Mem. at 13-14.) Defendants also argue that the information Defendant Watson had before the attack "do[es] not [re]present that an excessive risk of harm was present." (*Id.* at 14.) Plaintiff focuses on his statements to Defendant Watson before the attack that Mr. Bennett possessed a weapon, a felony, and that he had repeatedly expressed his fears about Mr. Bennett to Defendant Watson. (Pl.'s Opp'n at 7-8.)

Plaintiff has created a triable issue of material fact with regard to Plaintiff's Eighth Amendment claim against Defendant Watson. First, there is a genuine issue of material fact as to whether Plaintiff's placement with Mr. Bennett posed a known substantial risk of serious harm. Relevant factors in determining whether there was a substantial risk are "the nature of the prison population with whom [the plaintiff] was incarcerated, and whether there was specific information ahead of time suggesting that the plaintiff's safety was in jeopardy." *Vickers-Pearson v. City of N.Y.*, 2020 WL 5732028, at *5 (S.D.N.Y. Sept. 24, 2020). Plaintiff has presented evidence that Mr. Bennett was a known troublemaker (Morgan Dep. at 16), was supposed to be in a single cell rather than a shared cell (April 10 Grievance), had previously harmed other inmates and staff (*id.*), was acting in a mentally unstable manner (Morgan Dep. at 17-18), was making threats (*id.*), and possessed a weapon (*id.*). Thus, Plaintiff has presented evidence that Mr. Bennett was both generally dangerous and that he posed a specific, immediate threat of violence to Plaintiff. This is particularly true if Mr. Bennett's facially general threats to harm anyone who annoyed him or got in his way are construed to include targeting Plaintiff, with whom he shared an extremely small space. (Incident Report at PDF 46.) *See Matias v. Chapdelaine*, 2022 WL 4585438, at *6 (D. Conn. Sept. 29, 2022) (finding that vague statements that could reasonably be construed as threats by a jury can be evidence that there was a risk of harm to plaintiff); *c.f., Dublin v. N.Y. City Law Dep't*, 2012 WL 4471306, at *5–7 (S.D.N.Y. Sept. 26, 2012) (granting summary judgment to defendants where a verbal exchange preceding a fight did not include any threats).

Second, there is a genuine issue of material fact as to whether Defendant Watson had culpable intent. Plaintiff states under oath that he verbally told Defendant Watson he was afraid of his cellmate Mr. Bennett, who had a weapon, that he was making general threats to "whoever gets in his way," and that he was acting in an emotionally unstable manner.[7]

---

[7] Plaintiff requested of Defendant Watson that he be moved to another cell and filed a written follow up CN 9601 with Defendant Watson stating that he and Mr. Bennett were "not getting along," they had "had a verbal altercation," and Mr. Bennett was "doing a lot of things that

10

(Morgan Dep. at 17-18.) These statements amount to far more than "vague references to the plaintiff feeling uncomfortable about his cellmate," as Defendants claim. (Defs.' Mem. at 14.) Additionally, even though the CN 9601 did not specifically reference the weapon and mental health concerns, read in the context of Plaintiff's earlier statements to Defendant Watson, these factors are arguably encompassed by Plaintiff's statement that "[Mr. Bennett is] doing a lot of things that make me uncomfortable." (CN 9601.) Crediting Plaintiff's testimony, a reasonable jury could find that Defendant Watson was aware that Mr. Bennett posed a serious risk to Plaintiff's safety. *See Matias*, 2022 WL 4585438, at *6 (finding that a prison employee who was allegedly aware of a broad threat that could be construed as a threat to plaintiff could be found by a factfinder to have knowledge of the risk to the plaintiff).

Defendants attempt to minimize both the risk and Defendant Watson's knowledge of it, using Plaintiff's statements to Defendant Koellmer in Medical that he and Mr. Bennett did not have a problem and the attack came out of nowhere. (Defs.' Mem. at 13-14; Defs.' Reply Doc. # 71] at 6-7.) However, "[i]n determining whether a substantial risk of harm existed, the Court should not assess a prison official's actions based on hindsight but rather should look at the facts and circumstances of which the official was aware at the time he acted or failed to act." *Hartry v. Cnty. Of Suffolk*, 755 F. Supp. 2d 422, 436 (E.D.N.Y. 2010). Additionally, Plaintiff's statements do not contradict his communications to Defendant Watson. A reasonable jury could interpret them as meaning that there was no specific dispute between him and Mr. Bennett at the time of the attack beyond the more generalized threatening behavior that Plaintiff had reported to Defendant Watson, and it was the boiling water attack that came out of nowhere. Likewise, reasonable fact-finders, weighing Plaintiff's declaration and deposition testimony that Mr. Bennett was making generalized threats and his statements to his psychologist that Mr. Bennett was specifically threatening to stab a

---

[made Plaintiff] feel uncomfortable." (Morgan Dep. at 17; CN 9601.) The CN 9601 repeated Plaintiff's request that he be moved to another cell.  (CN 9601.)

11

corrections officer, could credit both statements, since neither the deposition nor the affidavit claims to be exhaustive inventories of the threats Mr. Bennett made, and it must be the fact-finders who determine Plaintiff's credibility. (Defs.' Reply at 6-7; Freedman Report [Doc. # 69-6] at 3.)

### a) Qualified Immunity

Defendant Watson claims entitlement to qualified immunity. (Defs.' Mem. at 28.) The "threshold inquiry" of a qualified immunity defense is "whether the plaintiff has alleged a violation of federally protected rights at all." *Naumovski*, 934 F.3d at 211. If a constitutional violation has occurred, "[a] government actor performing a discretionary task is entitled to immunity . . . if either (a) the defendant's action did not violate clearly established law, or (b) it was objectively reasonable for the defendant to believe that his action did not violate such law." *Johnson v. Newburgh Enlarged Sch. Dist.*, 239 F.3d 246, 250 (2d Cir. 2001). To be clearly established, a constitutional right must be "defined with specificity" and not "at a high level of generality." *City of Escondido v. Emmons,* 139 S.Ct. 500, 503 (2019). This occurs when a law "(1) was defined with reasonable clarity, (2) has been affirmed by the Supreme Court or the Second Circuit, and (3) where the conduct at issue would have been understood by a reasonable defendant to be unlawful under the existing law." *Looney v. Black*, 702 F.3d 701, 706 (2d Cir. 2012). An officer's conduct is objectively reasonable "if officers of reasonable competence could disagree on the legality of [their] actions." *Rohman v. N.Y.C. Transit Auth.*, 215 F.3d 208, 216 (2d Cir. 2000). "[S]ummary judgment on qualified immunity grounds is inappropriate where genuine issues of fact preclude a finding that an officer's actions were objectively reasonable." *Frederique v. Cnty. Of Nassau*, 168 F. Supp. 3d 455, 479 (E.D.N.Y. 2016).

Defendants argue that courts have not clearly established the existence of an Eighth Amendment right to protection from attacks by other prisoners in circumstances where there was no prior warning that the attack would occur, and Plaintiff did not provide

Defendant Watson with the information necessary to know of the danger. (Defs.' Reply at 9-10.) However, "[i]t is clearly established that inmates have the right to be free from harm inflicted by fellow prisoners and that corrections officers have an obligation to protect inmates from a known and substantial risk of serious harm." *Dublin*, 2012 WL 4471306, at *7. "Prison officials have a duty . . . to protect prisoners from violence at the hands of other prisoners," *Farmer v. Brennan*, 511 U.S. 825, 833 (1994), and "are liable for harm incurred by an inmate if the officials acted with 'deliberate indifference' to the safety of the inmate," *Hayes v. N.Y. City Dep't of Corr.*, 84 F.3d 614, 620 (2d Cir. 1996). *See also Morgan v. Dzurenda*, 956 F.3d 84, 88-90 (2d Cir. 2020) (reiterating the *Farmer* standard). As described above, while there is a genuine issue of material fact as to whether the threat to Plaintiff "was longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, such that a trier of fact could find that [Watson] had actual knowledge of the risk," *Morgan*, 956 F.3d at 90, the law is clearly established as to his duty to act. Thus, Defendant Watson has not demonstrated entitlement to qualified immunity.

### B. Intentional Infliction of Emotional Distress as to All Defendants (Count Five)

To prove a claim for intentional infliction of emotional distress, a plaintiff must show that "(1) that the actor intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of his conduct; (2) that the conduct was extreme and outrageous; (3) that the defendant's conduct was the cause of the plaintiff's distress; and (4) that the emotional distress sustained by the plaintiff was severe." *Appleton v. Bd. of Educ. of the Town of Stonington*, 254 Conn. 205, 210 (Conn. 2000). Conduct is extreme and outrageous if it "exceeds all bounds usually tolerated by decent society, of a nature which is especially calculated to cause, and does cause, mental distress of a very serious kind." *Huff v. W. Haven Bd. Of Educ.*, 10 F. Supp. 2d 117, 122 (D. Conn. 1998). Furthermore, motive does not bear on whether an act was outrageous; "it is the act itself which must be outrageous."

*Id.* at 123. "Whether a defendant's conduct is sufficient to satisfy the requirement that it be extreme and outrageous is initially a question for the court to determine. Only where reasonable minds disagree does it become an issue for the jury." *Appleton*, 254 Conn. at 210. Defendants argue that summary judgment is warranted because Defendants' actions were legal and thus per se not outrageous or unreasonable, and any distress Plaintiff suffered should be attributed to the conduct of Mr. Bennett, not Defendants. (Defs.' Mem. at 25-27.) In response, Plaintiff analogizes himself to a victim of domestic violence who is denied support by the police, resulting in worsened injuries and traumatic symptoms. (Pl.'s Reply at 17.)

Here, reasonable minds could disagree as to whether Defendants' conduct was extreme and outrageous. Defendant Watson ignored Plaintiff's reports that his cellmate possessed a weapon and was making threats, threatening Plaintiff with discipline rather than moving him to another cell. (Morgan Decl. ¶¶ 7-8.) Defendant Koellmer, despite Plaintiff's apparent severe injuries, did not call for medical attention, made him dress and walk, and threatened him with discipline. (Morgan Dep. at 31-32; Morgan Decl. ¶ 23.) Defendants Padin, Bacchus, Muscaro, Boswell, and Domitrz handcuffed and restrained Plaintiff despite immediately apparent severe injuries. (Morgan Dep. at 31-32, 35, 37, 43.) These Defendants also cuffed Plaintiff after being explicitly told by medical professionals that the cuffs were worsening Plaintiff's injuries. (*Id.*) Defendant Domitrz also threatened Plaintiff, the victim of a severe attack, with disciplinary treatment. (*Id.* at 42.) Additionally, Defendants used a form of cuffs, metal cuffs with and without a black box, that was particularly painful and injurious to Plaintiff's burned wrists, rather than available alternatives that would have caused Plaintiff less pain. (Morgan Dep. at 51-57, 61-63.) A reasonable mind could find that all of these acts, if proved, "exceed all bounds usually tolerated by decent society" and when recited "to an average member of the community

14

would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'" *Appleton*, 254 Conn. at 210-11.

This conclusion is underscored by the fact that as corrections officers Defendants held a position of power over Plaintiff. They had the authority to affect almost every facet of Plaintiff's life, from where and with whom he lived in the institution to his contact with his loved ones. (*See* Morgan Dep. at 34, 67 (discussing his extreme distress at the prospect of being sent to the RHU and losing access to visits with his family).) "[B]ehavior which otherwise fails to constitute extreme and outrageous conduct may yet rise to that intolerable level, and thus be actionable as [intentional infliction of emotional distress], when it arises from an abuse by the actor of a position, or a relation with another, which gives him actual or apparent authority over the other or power to affect his interests*.*" *Sangan v. Yale University*, 2006 WL 2682240, \*6 (D. Conn. Sept. 15, 2006); *see also Craig v. Yale Univ. Sch. of Med.*, 838 F. Supp. 2d 4 (D. Conn. 2011) (explaining that defendants' ability to control plaintiff's career supported a finding that defendants' conduct was extreme and outrageous).

Defendants' argument that because their conduct was lawful it was not outrageous is unpersuasive. Defendants cite *Brown v. Ellis*, 40 Conn. Sup. 165, 168 (Conn. Super. Ct. 1984), referencing the Restatement (Second) of Torts § 46, Comment g, to argue that "a claim for emotional distress will fail, even if the plaintiff suffered harm, where the conduct of the defendant was lawful." (Defs.' Mem. at 26.) However, neither the Connecticut Appellate nor Supreme court has ever held that an of act a party that is within their legal rights cannot form the basis for an intentional infliction of emotional distress claim.

The source of Plaintiff's emotional distress is also in dispute, with Defendants arguing that the distress Plaintiff suffered was due to Mr. Bennett's attack, not the actions of Defendants. (Defs.' Mem. at 26-27.) In response, Plaintiff proffers a psychological evaluation opining that after the attack Plaintiff has experienced ongoing, intense psychological distress and causally connecting that distress to Defendants' actions. (Freedman Report.) The report

states that Defendant Watson ignoring Plaintiff's anxieties about Mr. Bennet and "directly reinforced" Plaintiff's feelings of lack of safety and helplessness. (*Id.* at 8.) The report also states that Plaintiff's "traumatic reaction and lingering post-traumatic stress disorder are worse because of two important factors: the lack of response or protection when the danger from [Plaintiff's] roommate was first reported, and the punitive, physically harsh handling of his injuries after the attack." (*Id.*) The report goes on to state that:

> [a]wakening from a sound asleep in the dark, with intense pain, physical disorientation, still under attack, create a stark, terrifying experience for [Plaintiff]. Once the immediate danger to him was removed, [Plaintiff] was faced with the reality of the simplicity through which the attack could have been prevented. He was painfully aware that, contrary to his well-founded request for protection being heeded, he was threatened and intimidated into having no protective action taken on his behalf. From the time [Plaintiff] managed to restrain his attacker, correctional staff responded to the attack without any concern or medically sound response to [Plaintiff's] injuries. No medical staff were summoned, large areas of burned skin were further damaged by the use of metal restraints and demands for movement, and only the eventual intervention of the prison doctor steered him in the direction of appropriate medical help at a specialized burn unit.
>
> The two major contributing factors listed above were both avoidable, and would have gone a long way to reduce the traumatic impact and after-effects of [Plaintiff's] trauma. [8]

(*Id.* at 8-9.) Plaintiff has thus created a dispute of material fact as to the source of his emotional distress, as well as the nature of Defendant's treatment of him and whether Defendants knew or should have known its likely impact on Plaintiff.

### IV.   Conclusion

---

[8] This finding is consistent with research finding that institutional actors' failure to prevent or respond appropriately to a traumatic event can be traumatic in its own right. Carly P. Smith et. al., *The Psychology of Judicial Betrayal*, 19 Roger Williams U. L. Rev. 451, 459-60 (2014).

For the reasons given above, the Defendants' motion for summary judgment is DENIED as to Counts One and Five and GRANTED as to Counts Two, Three, and Four. The parties' joint trial memorandum is due on January 19, 2023. A final pretrial conference will be held on February 2, 2023; jury selection will be held on February 7, 2023. This matter is also referred to a randomly selected Magistrate Judge for the purpose of conducting a settlement conference.

        IT IS SO ORDERED.

                /s/
        Janet Bond Arterton, U.S.D.J.

        Dated at New Haven, Connecticut this 29th day of December, 2022